BANCO DE PUERTO RICO, como liquidador del BANCO COMERCIAL DE PUERTO RICO, demandante y apelado, *v.* TOMÁS RODRÍGUEZ, ANGELINA M. DE RODRÍGUEZ y RAFAEL RODRÍGUEZ, demandados y apelantes.

Núm. 7390.—*Sometido:* Febrero 1, 1938. *Resuelto:* Mayo 13, 1938.

*Dubón & Ochoteco,* abogados de los apelantes; *C. Domínguez Rubio y Luis Domínguez Rovira,* abogados del apelado.

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

El 5 de septiembre de 1931, en Cayey, P. R., los demandados firmaron y entregaron al Banco Comercial de Puerto Rico un pagaré que copiado a la letra, en lo pertinente, dice:

"Montante $15,082.25.—Vencimiento Octubre 30 de 1931.—Pagaremos solidariamente al Banco Comercial de Puerto Rico, en el local de su establecimiento o a su orden, el treinta de octubre de mil novecientos treinta y uno la suma de quince mil ochenta y dos con 25/100—*dollars,* valor recibido en préstamo y nos obligamos también solidariamente a pagar ·intereses de doce por ciento anual en caso de· mora y las costas y gastos que ocasione el cobro de esta deuda y los honorarios del abogado que el Banco utilice en caso de reclamación judicial...."

Y el 18 de diciembre de 1934 el Banco de Puerto Rico, como liquidador del Comercial, inició este pleito en cobro del mismo.

Los demandados admitieron que habían suscrito y entregado el pagaré y que no lo habían satisfecho, alegando que no estaban obligados a ello por haber prescrito la acción del demandante por el transcurso de tres años de acuerdo con el artículo 946 del Código de Comercio, edición de 1932.

Insistió el demandante en que su acción no había prescrito porque el precepto invocado por los demandados no era aplicable ya que el pagaré que ellos firmaron y le entregaron no era "de comercio."

Trabada así la contienda fué el pleito a juicio, dictando la corte sentencia en contra de los demandados por entender que:

"No se ha demostrado en este caso que el préstamo que ha dado lugar a la expedición del pagaré que sirve de base a la presente acción, constituya una operación mercantil, pudiendo más bien, inferirse lo contrario de las explicaciones dadas por los testigos señores Juan Diez de Andino y Francisco Fernández Colón, y por tanto, el pagaré en cuestión sólo puede ser considerado como expresión de la obligación de devolver una cantidad prestada con el interés pactado, a cuyo préstamo tampoco puede dársele el carácter de mercantil por faltar en él la segunda de las condiciones que requiere el artículo 229 de nuestro Código de Comercio, por no haberse demostrado, a nuestro juicio, que el dinero prestado se destina a actos de comercio, sino que más bien el mismo se obtuvo y fué empleado por los demandados en la agricultura y en el ramo de siembra de tabaco, al cual ellos se dedicaban preferentemente. . . ."

Los demandados apelaron para ante este tribunal. Señalan varios errores que no será necesario estudiar separadamente porque todo en este caso se funda finalmente en una cuestión, a saber: si el pagaré de que se trata es o no mercantil.

Conocemos sus términos. En el juicio, por el demandante declararon los testigos Diez de Andino y Fernández Colón.

El primero era empleado del Banco Comercial y siguió siéndolo a las órdenes del síndico. Dijo que la obligación no había sido satisfecha, que el Banco Comercial no tenía establecimiento mercantil alguno, que no hacía préstamos sobre provisiones, sino con firmas o con garantía hipotecaria o pignoraticia.

El segundo manifestó que estuvo al frente de la Sucursal que el banco tenía en Cayey; que conocía a los demandados

ninguno de los cuales era comerciante, dedicándose a la agricultura, comprando también y vendiendo ganado, café, tabaco y fincas urbanas.

Por los demandados declararon dos de ellos, Tomás y Rafael Rodríguez.

Dijo el primero que su ocupación era "industrial, agricultura," dedicándose con preferencia a los negocios de compraventa de frutos y ganado, y luego a repreguntas del abogado del demandante, contestó como sigue:

"P. ¿Cuánto tabaco sembraba usted? R.—Pues yo sembraba, por ejemplo, quinientos quintales de tabaco y reunía dos mil, para eso era que el Banco Comercial me daba a mí la mayor parte del dinero y yo compraba tabaco porque para la refacción yo no necesitaba porque la refacción mía de quinientos quintales de tabaco . . . mire, ahora mismo yo estoy sembrando y no cojo, pero entonces yo me dedicaba más a la compra. P.—¿De modo que usted compraba tabaco con ese dinero que el banco le daba? R.—Sí, señor. P.—¿Usted no tenía comercio? R.—No, señor. P.—¿No tenía tienda de comercio? R.—No, señor. P.—¿Ni tampoco su esposa? R.—No. P.—En el año ése 31, ¿usted puede decirnos a la corte aquí . . . ese dinero . . . estos \$15,082.25 que es el montante de esta obligación, en qué operaciones usted, de compra de tabaco, usted lo invirtió? R.—Ese dinero no me lo dió el banco a mí de una sola vez, quince mil pesos. El banco me daba tres mil pesos, tres mil más, dos mil, cinco mil, según yo iba necesitando de acuerdo con las compras que yo hacía de tabaco o compraba un solar o cualquiera cosa y yo cogía del banco y suscribía un pagaré por la cantidad que yo cogía. . . . P.—¿Pero es lo cierto que ese dinero estaba en el banco a disposición de usted como un préstamo? R.—Sí, señor. . . . P.—¿Pero con respecto a esta operación específica de \$15,082, cómo invirtió usted ese dinero si se acuerda? R.—Pues en su mayoría lo invertí en comprar y dinero extraño que yo puse en el banco de la cooperativa de la cual era presidente como dos mil quintales de tabaco, que s. s. sabe que se vendió a 7 u 8 pesos tabaco que costó a 30, 31 y 32 pesos y de ahí viene el desastre que se perdió todo y ese dinero lo empleé yo en ese tabaco . . . P.—Yo le voy a hacer la siguiente pregunta: ¿con parte de esos \$15,082.25 compró usted o no compró el tabaco o parte del tabaco que usted depositó después en Tabacaleros? R.—Sí, señor. P.—¿Qué más usted compró con parte de ese dinero? R.—Pues compraba ganado, solares, casas, vendía y compraba, ése era mi negocio antes, hoy no porque hoy no tengo con qué...."

Y manifestó el segundo que se dedicaba a negocios y agricultura, siendo su principal negocio la compraventa de tabaco y ganado.

Repreguntado por el abogado del demandante, contestó:

"P.—Dígame don Rafael, ¿desde cuándo se dedica usted a esos negocios de compraventa de tabaco y de ganado? R.—La he tenido toda la vida, la heredé de mi padre . . . P.—¿Usted también siembra tabaco? Sí, señor . . . P.—¿Usted puede asegurar a la corte que en septiembre de 1931 usted compró tabaco? R.—En el tiempo de la cosecha yo siempre he comprado tabaco hasta ahora hace un par de años. P.—¿Y cuándo son esas cosechas? R.—Pues en este tiempo, desde abril y mayo. P.—¿Y ganado? R.—Y ganado todo el año estoy comprando. P.—¿Se dedica a la matanza? R.—A la matanza y a la compraventa. P.—¿En Cayey? R.—En Cayey. P.—¿Usted tiene fincas en la actualidad? R.—Tenemos una finca ahí mi hermano y yo en sociedad . . . P.—Don Rafael, ¿a quién usted le compró ganado en septiembre del 31? . . . R.—Pues a varios. P.—Pero dígame los nombres. R.—Yo compré en Aibonito, en Coamo. P.—¿A quién le compró en Aibonito? R.—En Aibonito le compré a muchísimos, Ramón Ortiz a otro que se llama Negrón de apellido, a don Paco Gil, a muchísima gente. P.—¿Para la matanza? R.—Para la matanza. En Cayey, a los Aragunde, a don Agustín Fernández, a la Central Cayey, y a todos los que me venden. P.— ¿Usted también sembraba tabaco? R.—Un poquito. P.—¿Como cuántos quintales era el poquito ése? R.—Como doscientos quintales. . . P.—¿Usted también tenía refacción? R.—Sí, tenía. P.— ¿También tenía medianeros? R.—También tenía medianeros. P.—Y compraba tabaco usted también? R.—Sí, compraba . . . P.—¿Usted alguna vez tuvo tienda de comercio? R.—Nunca, nunca, allá cuando joven . . . Hace más de treinta años. P.—¿Pero en el año 31 usted no tenía tienda? R.—No, señor. P.—¿Ni Rafael tampoco? R.—Ni Tomás tampoco. P.—Perdone, ¿ni tampoco se dedicaba a hacer negocios doña Angelina su cuñada de usted. R.—Tampoco."

## Dice el artículo 946 del Código de Comercio:

Artículo 946 (*Artículo 950, Código de Comercio de 1886, enmendado según la Ley Núm. 42 de 1930, pág. 321*).—Las acciones procedentes de letras de cambio se extinguirán a los tres años de su vencimiento, háyanse o no protestado.

"Igual regla se aplicará a las libranzas y pagarés de comercio, cheques, talones y demás documentos de giro o cambio, y a los cupones

e importe de amortización de obligaciones emitidas conforme a este Código.''

Ese artículo es igual al 950 del Código de Comercio publicado en la Compilación de 1911, pág. 1320, con excepción de que a virtud de la enmienda quedaron eliminados del párrafo segundo los ''dividendos'' del término de prescripción que establece.

De acuerdo con la jurisprudencia, un pagaré otorgado a la orden, como lo fué el que dió origen a este pleito, tiene la presunción *juris tantum* de mercantil. *Pierluisi* v. *Monllor,* 42 D.P.R. 7, *Vázquez* v. *Laíno,* 23 D.P.R. 235, y *Blondet* v. *Garáu,* 47 D.P.R. 863 y las autoridades que se citan en los mismos.

¿Quedó la presunción destruída? Recientemente en el caso de *Barceló & Co., S. en C.* v. *Olmo,* 48 D.P.R. 247, en que también se trataba de un pagaré otorgado a la orden, esta corte, por medio de su Juez Asociado Sr. Hutchison, se expresó así:

''No podemos convenir con la corte inferior en que la transacción original celebrada por López y Carlos Olmo fué una transacción mercantil. Un préstamo no es necesariamente una transacción mercantil. Ni López ni Carlos Olmo eran comerciantes al momento en que se efectuó el préstamo, De haber sido comerciantes uno u otro, o si ambos hubieran sido comerciantes al momento de efectuarse el préstamo, tal hecho no hubiese convertido el préstamo en una transacción mercantil. López era agricultor. Nunca había sido comerciante. No tenía la intención de serlo ni se convirtió en tal cuando él y Javier otorgaron la escritura notarial que nominalmente le hizo miembro de la razón social de Javier Olmo y Cía. Él nunca recibió ni esperaba recibir, ningún sueldo ni utilidades de los negocios de Javier Olmo y Cía. Durante la existencia de la sociedad no recibió, ni esperaba recibir intereses por la suma de dinero anticipada. El mismo pagaré otorgado unos dos años más tarde devengaría intereses tan sólo después de su vencimiento. Aún la idea de sustituir el nombre de López por el de Carlos Olmo en la escritura notarial no partió de López, sino que fué sugerido por el notario debido al hecho de que Carlos Olmo era menor de edad. El mero hecho de que el préstamo fuese otorgado con el fin de permitir al prestatario que se dedicara a un negocio y de que el producto del mismo se uti-

lizara para la compra de mercancías, confundiéndose así en los negocios mercantiles de Javier Olmo & Cía., no convirtieron el préstamo en una transacción mercantil. La naturaleza del préstamo depende del carácter de la transacción misma, conforme lo revelan las circunstancias que rodean el caso o los hechos que la preceden, mas no el fin para el cual se hace ni la forma en que su producto era invertido o utilizado. Todas las circunstancias concurrentes tienden persuasivamente a la conclusión de que el préstamo otorgado en este caso no fué una transacción mercantil y por ende que la acción no había prescrito por el transcurso de tres años, no embargante la presunción *juris tantum* que surge del hecho de que el pagaré en cuestion había sido expedido a la orden.''

La Corte Suprema de España, en un caso de un pagaré a la orden, por sentencia de abril 10, 1894, sentó la siguiente doctrina:

''Que para tener el valor jurídico de documento mercantil un vale o pagaré, no basta que éste contenga las condiciones que expresa el art. 571 del Código de Comercio; es preciso además que proceda de operaciones mercantiles, según exige el 558:

''Que no se encuentra en este caso el pagaré en que sólo se expresa que el prestatario recibió una cierta cantidad para un asunto de comercio, manifestación aislada que no demuestra que el préstamo procediera, como quiere la ley de operación mercantil; ni puede tener valor legal, no probándose la verdad del hecho de haberse dedicado aquella cantidad a dicho objeto.'' (75 J. C. 483.)

Y en otro de igual naturaleza, por su sentencia de 11 de octubre de 1919, decidió:

''Que conforme a la doctrina establecida por resoluciones de la Sala, al hacer aplicación del art. 2º del vigente Código de Comercio, es cuestión de hecho de la privativa apreciación del Tribunal juzgador, la de declarar qué actos son o no comerciales, en cuanto revisten o dejan de tener el concepto de mercantiles.

''Que son muy repetidos los fallos del Tribunal Supremo, en los que de modo uniforme ha determinado claramente la inteligencia e interpretación rectas, que al aplicar los artículos 59, 531, 532 y 533 del Código de Comercio, ha de hacerse, y por aquéllos viene declarado, que tan sólo cuando hubiere dudas imposibles de resolver con arreglo al artículo 2º, se decidirá la cuestión a favor del deudor, y que para tener el valor jurídico de documento mercantil un pagaré

no basta que contenga las condiciones marcadas en el art. 571 del antiguo Código de Comercio; que hoy señala el 531 del que rige, sino que es preciso, además, que proceda de operaciones comerciales, según exigía el artículo 558 del Código de 1829, y ordena el repetido 531, en su número 7, requisito que no se especifica en el pagaré que consigna la frase 'valor recibido', ya que esto no es lo preceptuado por el artículo. 532, al objeto de que surta los efectos en el mismo señalados, porque es preciso e ineludible haber probado que el prestatario dedicó a negocios mercantiles la cantidad percibida.'' (144 J. C. 387.)

En la Exposición de Motivos del Título V, Libro II del Código de Comercio, se expresó el legislador español, en parte, así:

''Entre las novedades introducidas en la doctrina del Código vigente sobre préstamos, es digna de notarse, en primer término, la que atribuye carácter mercantil a todos los contraídos con destino a operaciones de comercio, siempre que alguno de los contrayentes, el mutuante o mutuatario sean comerciantes, derogando, en esta parte, el precepto demasiado restrictivo del Código, que exige en ambas partes aquella cualidad para reputar, como mercantil, cualquier préstamo. A beneficio de esta reforma quedarán amparados y protegidos por la legislación comercial gran número de préstamos, que se rigen actualmente por el Derecho civil, a pesar de constituir en rigor actos de comercio, sólo porque uno de los contratantes es ajeno a esta profesión y se facilitará, además, la colocación de capitales en este ramo de la actividad humana, estimulados por el aliciente del lucro y por las mayores garantías que ofrece aquella legislación.'' (El Nuevo Código de Comercio para la Península y las Antillas, por Vicente Romero y Girón, segunda edición, pág. 238.)

Y R. Gay de Montellá, en su Código de Comercio comentado, Tomo III, pág. 121, dice:

''Los préstamos mercantiles, se caracterizan bien por el carácter de comerciante de alguno de los contratantes, bien por destinarse las cosas prestadas a actos de comercio. El préstamo mercantil es contrato que puede concertarse entre comerciantes, pero las características especiales de este contrato se hallan principalmente en el comercio bancario y de exportación. Estudiaremos a continuación las modalidades especiales de préstamo mercantil que forman hoy la armadura del comercio moderno.

"Los préstamos mercantiles suelen concertarse: bien obligándose un comerciante o banquero a prestar a otra persona comerciante o no, cierta suma, a medida que vaya teniendo necesidad de ella, a lo cual se llama tener *crédito abierto* (*apertura de crédito*), bien autorizando a una persona a disponer de un crédito hasta cierto límite y a restituirlo por medio de entregas parciales, a lo que se llama relación de *cuenta corriente,* o bien subscribiendo promesas de pago o reembolso, cuya forma y efectos varían según el modo y manera cómo se expresen (subscripción de letras o de pagarés). Todos estos préstamos pueden ser hechos con garantía de efectos o valores o sin ella. Los primeros son acompañados por la *cobertura,* hipoteca, prenda, aval, letras en garantía, etc. Los segundos no tienen otra garantía o responsabilidad, que la personal del prestatario."

Examinada la evidencia a la luz de la ley y de las anteriores decisiones, motivos del legislador y comentarios, el caso resulta en verdad algo dudoso a nuestro juicio. La tendencia de las cortes es la de no aplicar la prescripción a menos que aparezca enteramente clara la naturaleza mercantil de la transacción, ya que se trata de un plazo relativamente breve y de deudas cuya existencia ni siquiera se discute. Siguiendo esa tendencia y dando todo el peso que merece al juicio que formara el juez sentenciador, debemos resolver la duda en contra de los demandados. Son además las declaraciones de éstos—única evidencia que introdujeron—vagas e incompletas. Suficientes para levantar la incertidumbre en el ánimo del juzgador, no lo son para convencerlo de que el préstamo se concertara para que ellos—no comerciantes de profesión—dedicaran el importe del mismo a operaciones mercantiles que llevaran luego en realidad a efecto, y no para el fomento de sus fincas y, por supuesto, para cualquiera otra operación que se les presentara en el curso ordinario de sus negocios y que estimaran beneficiosa para ellos realizar.

*Bajo esas circunstancias consideramos que debemos declarar el recurso sin lugar, confirmando la sentencia apelada.*